RURAL WATER DISTRICT NO. 1, ELLSWORTH COUNTY, KANSAS, commonly known as Post Rock Rural Water District, a/k/a Ellsworth County Rural Water District No. 1, Plaintiff,

v.

CITY OF WILSON, KANSAS, Defendant.

No. 96–1297–WEB.

United States District Court, D. Kansas.

July 19, 2002.

---

Victor S. Nelson, Royce E. Wallace, Wichita, KS, for Plaintiff.

Allen G. Glendenning, Watkins, Calcara, Rondeau, Friedeman, Bleeker, Glendenning & McVay, Chtd., Great Bend, KS, for Defendant.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This matter came before the court on October 2, 2001, for a bench trial following remand from the Tenth Circuit Court of Appeals. At the conclusion of the trial, the court took the matter under advisement and gave the parties a period in which to file proposed findings of fact and conclusions of law. The court has reviewed those filings and is prepared to rule. Further oral argument would not assist in deciding the issues presented.

I. Background.

Plaintiff Rural Water District No. 1 of Ellsworth County, Kansas (commonly known as "Post Rock Rural Water District," and hereinafter referred to as "Post Rock") brought this action alleging that the City of Wilson, Kansas, was violating 7 U.S.C. § 1926(b) by providing water service to certain customers in Post Rock's service area. Post Rock sought declaratory and injunctive relief under 42 U.S.C. § 1983 to prevent the City from providing

water service to these users without Post Rock's approval.

Section 1926(b) of Title 7 protects federally—indebted rural water associations from municipal encroachment. *North Alamo Water Supply Corp. v. City of San Juan,* 90 F.3d 910, 915 (5th Cir.), cert. denied, 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996). The statute serves two primary purposes: it encourages rural water development by expanding the number of potential users, resulting in a lower cost per user, and it safeguards the viability of associations and FmHA [now USDA Rural Development] loans, protecting both from the expansion of nearby towns and cities. *Scioto County Reg. Water Dist. v. Scioto Water Inc.,* 103 F.3d 38, (6th Cir. 1996). It prevents municipalities from providing water service to users within a covered association's territory if the association has "provided or made [service] available." § 1926(b).

Under § 1926(c), Post Rock has the legal right to provide water service to all of Ellsworth County except the incorporated cities, including the City of Wilson as it existed on March 5, 1979. The City has its own wells and water treatment and distribution systems. Pursuant to § 1926(c), customers in Post Rock's service area must receive water service from Post Rock or provide their own water; they are prohibited from connecting to the City water system unless Post Rock has not made service available or releases them from the water district. In its current posture, the dispute turns on whether Post Rock made service available to certain users.

The first bench trial in this case was conducted on September 15, 1998. That proceeding dealt with three specific properties in Post Rock's service area: the Purma Addition, the Prairie Estates Addition, and the Branda property. The court denied Post Rock's request for injunctive

relief with respect to the latter two properties. The court found that any injunctive relief as to the Prairie Estates Addition was premature because Post Rock failed to show when, if ever, there would be any users in that addition. The court also denied relief with respect to the Branda property, on the grounds that Post Rock failed to show it was capable of serving that property.

As to the Purma Addition, the court granted conditional injunctive relief in favor of Post Rock against the following background. In January of 1995, an attorney for Post Rock had written a demand letter to the City of Wilson asserting Post Rock's rights under § 1926(b). At that time, the Purma Addition was outside the city limits of Wilson and was within Post Rock's service area. In March of 1995, representatives of Post Rock met with City officials to try and work out an agreement, but no agreement was reached. In March of 1995 the City adopted an ordinance requiring a minimum fire flow of 600 gallons of water per minute for all parties selling water within the City limits. (The ordinance was repealed in 1997.) The Purma Addition was annexed by the City in April of 1995. The annexation did not affect the parties' respective rights under § 1926. See 7 U.S.C. § 1926(b) (the association's service cannot be curtailed "by inclusion of the area served by such association within the boundaries of any municipal corporation"). In December of 1995 the City installed a six-inch water main in the Purma Addition. Then, as well as now, development in the Purma Addition consisted of two duplexes. Post Rock undertook an engineering study in 1997 and determined that adding the two duplexes to the Post Rock system was feasible and would require the laying of about 4860 feet of pipe (in order to connect to Post Rock's nearest 10″ main line). Post Rock estimat-

ed the cost of extending a line to the duplexes to be $32,000. Pursuant to its policies, Post Rock maintained that the first user to connect to the system would be responsible for this cost. Post Rock would own the line, however, and would not refund any of the cost to the duplexes' owner if other users were later added to the line. (As is noted infra, Post Rock changed this policy after the first bench trial.) The owner of the duplexes did not apply for membership in Post Rock; instead, it obtained water from the City, which began providing water for domestic use in the Purma Addition in July of 1997.[1]

The City uses the same water mains for domestic water and fire protection.

In its ruling after the first bench trial, the court concluded that conditioning water service upon a user's agreement to pay unreasonable fees was not "making service available" under § 1926(b), and further found it would be unreasonable to require the owner of the duplexes to pay a fee of $32,000 to connect to Post Rock's system. Nevertheless, the court found the City had violated § 1926(b) by encroaching upon the Purma Addition before Post Rock had had the opportunity to make service available. Accordingly, the court enjoined the City from continuing to provide water service to the Purma Addition if Post Rock agreed to provide such service in a reasonable time and at a reasonable cost.

On appeal, Post Rock argued (among other things) that under § 1926(b) the reasonableness of the cost to the user was not relevant in determining whether the association had made service available. A majority of the Tenth Circuit panel disagreed, finding that cost was a relevant consideration. *Rural Water Dist. No. 1 v. City of*

*Wilson*, 243 F.3d 1263, 1270–71 (10th Cir. 2001). But the Circuit said the appropriate test was whether the fees or assessments were "unreasonable, excessive, and confiscatory." Id. at 1271. If they were, then the water district had not made service available. The Circuit identified four factors relevant to this inquiry and said this court had not explained or cited evidence for its finding that Post Rock's proposed fee was unreasonable. *Id.* The Court stated:

[W]e conclude that the case should be remanded to the district court for further consideration of Post Rock's imposition of the $32,000 fee. On remand the City should be afforded an opportunity to show that Post Rock's practice was excessive, unreasonable, and confiscatory. If the City makes such a showing, then the court should conclude that the water district has not "provided or made [service] available." See 7 U.S.C. § 1926(b). Absent such a showing by the City, the water district will be entitled to relief under § 1926(b).

*Id.* at 1272. The related question of attorney's fees was also remanded. The Circuit affirmed the judgment with respect to the Prairie Estates Addition and the Branda property. *Id.* at 1275–76.

## II. Findings of Fact Upon Remand.

A number of background facts were set forth in the Court's opinion and order of October 26, 1998, and will not be fully repeated here. The Court hereby incorporates by reference its findings of fact set forth on pages 2–12 of the October 26, 1998 Order, which were not challenged on appeal.

---

1. The City began providing water to the Purma Addition for fire protection in 1995, and by 1997 it was providing water for domestic use. Post Rock only challenges the providing of domestic water in the Purma Addition; it concedes the City had a right to supply water for fire protection.

1328

The following recitation of testimony is not intended as an exhaustive statement of the evidence on remand; it is merely a summary of certain relevant points.

John Butel served as a member of the Osage County Rural Water District No. 5 for thirty years. He testified, as did nearly all of the witnesses, that it was standard practice for a rural water district to charge a new user the cost of connecting the user's property to the district's supply line. (In the course of the retrial, the City stipulated that this was standard practice for rural water districts.) Butel testified that in his experience this cost had ranged from $200 to $18,000, and was most commonly around $3,000. Butel's district typically charged the user for all actual costs incurred in extending a supply line to the user's property, including pipe, labor, valves, and easements. Additionally, the district included a ten percent surcharge for overhead, as well as the cost of a benefit unit in the rural water district, which in Butel's district was $4,000.

Butel indicated his district took into consideration the economic feasibility of serving a particular customer, and if a user could be served more economically by a neighboring district, the other district was typically allowed to serve that customer. He said it was sometimes a question of who could build a line the cheapest. Butel said his district had never forced a user to hook up where another district could do it cheaper. Butel also said that when other users were added to an extension paid for by an initial user, his district would refund a portion of costs to the initial user for a period of up to five years.

Robert Calhoun, the Chairman of the Board of the Osage Rural Water District No. 8, testified by way of deposition. Def. Ex. G. He said there were about ten occasions when his district allowed a customer within the district's boundaries to hook up to a neighboring district or city. They had released one individual to the City of Burlingame who was facing "astronomical" costs between $20,000 and $30,000 for connecting to the district. Calhoun said if providing service would result in an astronomical cost to the customer, the district should not try holding that customer. He recalled that the district had extended service to one property for about ten to twelve thousand dollars, which he thought was probably the highest amount the district had ever charged. Calhoun said his district does not require a potential customer to purchase a benefit unit before a cost estimate is provided, but the customer typically pays the engineering fee necessary to obtain the estimate. Calhoun said his district would refund a portion of costs to an initial user who paid for an extension if other users were added to the same extension within five years.

Edward Dunn has been an attorney and/or manager for Jackson County Rural Water District No. 3 since 1971. He said that when a person asks to be released from his district, the district takes into account (among other things) what is in the best interest of the user, including the cost of hooking up. The district also considers the size of the lot and nature of the property, such as whether it will be used for a residence or a factory. The district's practice was generally to release a single residence if the home could be more economically served by a neighboring district. Dunn indicated his district would be reluctant to release an entire subdivision, since it would probably be economical to connect a subdivision with a large number of lots even though it would not be economical for a single residence. In the case of a subdivision, his district would typically charge the developer the entire fee, and the developer would then allocate the costs to individual lots and recover those expenses as

lots were sold. Dunn said his district had never forced a customer to hook up to its water supply when a cheaper source was available from a neighboring system.

Allen Soetart is the manager of the Johnson County Rural Water District No. 7. He testified that his district had exchanged customers with the City of Gardner due to the relative cost of serving those customers.

Elmer Ronnebaum, the general manager of the Kansas Rural Water Association, wrote an article entitled "Boundary Battles," in which he discussed disputes between neighboring water districts. Def. Exh. E. Ronnebaum testified that such districts should consider the best interests of the customer and should attempt to provide service in the most economical means possible. He testified that his association had supported a bill (now enacted as part of K.S.A. § 82a–630) to permit a landowner to appeal to the local county commission if a rural water district denies the landowner's request to be released from the district. Ronnebaum's article discussed the purposes of § 1926(b) and noted the statute was intended to prevent federally-indebted rural water systems from being forcibly annexed or "cherry picked" by another system or municipality. He wrote that most districts have cooperatively resolved any conflicts, and added that "[r]ural water systems should only utilize 1926(b) in extreme cases where expanding systems attempt to unilaterally, without discussion, acquire service areas." Exh. E at 2. Ronnebaum testified that the average cost of a benefit unit in Kansas is $1,850. Post Rock charges $800 for a benefit unit, plus a $100 engineering fee.

Alen Soelter, a licensed civil engineer with a firm in Topeka, Kansas, has worked on rural water system projects since 1983. Soelter testified it is common practice for rural water districts to add an administrative fee when a customer is charged the cost of hooking up. Soelter testified there is a trend away from reimbursing or rebating costs to initial users when others are added to a line, due to the administrative burden of such a practice. He said if a district anticipates growth in a particular area and uses a larger extension line for additional capacity, the district will typically pay the cost of upgrading the pipe beyond what is currently necessary. He said cost and who can best serve a customer are factors considered in deciding whether to release a customer to a neighboring district, but he noted that a district would not ordinarily release a customer if the district could provide cost-effective service.

Eleanor Hunter, the Mayor of Wilson, testified about the duplexes in the Purma Addition. Hunter is a member of the board of directors for the Wilson Economic Development Corporation (hereinafter "WEDC") and the Ellsworth County Economic Development Corporation ("ECEDC"). She said the WEDC initially purchased the Purma Addition, but the ECEDC had more funds so the land was given to the ECEDC to build the duplexes. The WEDC has funds to build one house in the adjacent Prairie Estates Addition, but any such plans are on hold due to this lawsuit. The WEDC operates on a shoestring budget, and could not afford to pay twenty or thirty thousand dollars to obtain water. If such a fee were required, the WEDC would likely not build in the Prairie States Addition.

Rex Muchow, the chairman of the board of directors of Post Rock, testified that since the end of Post Rock's initial construction phase (which was funded by FmHA loans), new customers have been charged the cost of extending Post Rock's service to their property. Muchow said that in 1999 (subsequent to the first trial in this case) Post Rock adopted a new policy

to give pro-rated rebates to initial customers who pay for an extension if additional users are thereafter added to the line. Muchow also testified that when Post Rock anticipates growth in an area where a customer requests service, and the district decides to install a larger pipe in anticipation of future demand, the district will not charge the user the costs associated with upgrading the line. Muchow testified that in the past some customers have been released by Post Rock to the City of Wilson through an agreement with the City.

David Bailey, the general manager of Post Rock, testified that he had "updated" estimates from the first trial on how much it would cost to hook up the duplexes in the Purma Addition. Although the defendant objected to such evidence as being beyond the scope of the Circuit's remand (Tr. at 136), the court allowed Post Rock to make a proffer of the evidence, and the court informed the parties it would determine the admissibility of these new estimates after the parties submitted their proposed findings of fact and conclusions of law. Tr. at 149. Bailey's estimate at the second trial is that it would cost $15,770.96 in construction costs to connect the two duplexes with a 2½ pipe from Post Rock's main line. Pl. Exh. 28a. Including the cost of a benefit unit and other fees, Bailey's estimate of the total cost to the user would be $19,370.96. Bailey also estimated that if a 4 inch pipe were used instead (which would provide greater capacity and accommodate future expansion), the total construction cost would be about $23,603, and the total cost to the user would be $27,203. See Pl. Exh. 29a and Tr. at 142–43. Bailey also made an estimate for an alternate route using a better grade 4 inch pipe, which would result in a total cost to the user of $37,900.80. Pl. Exh. 30. These estimates do not include extra costs that would arise if excavation through rock were required in laying the pipe. Plaintiff's Exhibit 15 contains the April 28, 1997 estimate of connection costs as determined by engineer Michael Olsen. This was the only estimate introduced into evidence in the first trial. Olsen estimated that providing service to the two duplexes with a 2½ pipe would cost the user $32,000. Pl. Exh. 15.

Bailey provided a written summary of various service connections performed by Post Rock from 1991 to the date of trial. Pl. Exh. 31. This exhibits shows that the average length of pipe for these connections was about 950 feet, and the longest connection was around 8,400 feet. The largest total cost to the customer shown on the exhibit was $12,202.78, which resulted from a connection requiring 8,206 feet of pipe. Several connections in the range of 3,000 to 5,000 feet in length resulted in total costs to the user of between $6,000 and $8,000. The exhibit excludes certain connections in 1995 that were paid for by federal grants.

Bailey testified that Post Rock's retail water rates are $4.25 per thousand gallons for the first 20,000 gallons, and $2.75 per thousand thereafter. There is a $30 per month minimum fee.

Bailey said that on one occasion Post Rock had reached an agreement with the City of Ellsworth to release a certain customer because it was much easier for Ellsworth to provide service. Part of that agreement was an understanding that if Post Rock brought additional lines into the area it would reclaim the customer.

Bailey participated in communications with the Wilson Economic Development Board about the possibility of obtaining water service from Post Rock for the Purma Addition. Bailey said the Board asked him about cost and he told them he would need a commitment from them to pay the $300 $500 engineering fee required for an

estimate. WEDC never applied for service from Post Rock.

John Kasper, an attorney who sometimes represents the City of Wilson, testified that three different people own portions of the Purma Addition. One part on the east side—consisting of two blocks—is owned by Dr. Dennis Kepka and his wife. A part of a block on the west side is owned by Ellsworth County Economic Development. It contains the two duplexes in question. The duplexes contain a combined total of four dwelling places. The balance of the property on the west side is owned by the Wilson Economic Development Corporation. The duplexes are located about a block away from the City's water line and were easily connected to the City line. The cost to the user was essentially the cost of a new meter-about $250.

The City spent about $18,000 to install water mains in the Purma Addition. The City uses the same mains for domestic and fire protection water.

The City has kept funds received from the sale of water to the meters in the Purma Addition in a separate interest—bearing account since 1995. As of June 2001, the total fund including interest amounted to $3,085.42.

As the foregoing evidence makes clear, it is standard practice among rural water districts in Kansas to charge new customers the cost of extending water service to the customer's property. The cost typically includes pipe, labor, valves, and easements, and the price of a benefit unit in the association. Districts sometimes include a ten percent surcharge to cover overhead expenses.

It is also standard practice for rural water districts to take into account whether it is economical to provide service to a particular user. This includes not only a consideration of potential revenue to the district, but also consideration of the cost to the customer and whether the customer can obtain cheaper service from a neighboring district or city. The mere fact that a cheaper source is available elsewhere is not dispositive. But when the logistics of connecting a particular user would result in an unusually high connection fee, it is common practice among districts to permit the customer to obtain service from a nearby district or city. This is particularly true if a potential customer is a small user such as a single family residence. The two duplexes in the instant case would be considered by most districts as small users. By contrast, service to a significant commercial operation or a large residential subdivision would likely be retained by a district due to the prospect of substantial revenue and the fact such users can readily absorb and offset the cost of service, either through the receipt of business revenues or by dividing the cost among many users.

The value of the water service for the two duplexes in this case is relatively small. As noted previously, since 1995 the service has generated a total of $3,085.42 in fees and interest for the City.

The $32,000 fee estimated by Mr. Olsen for connecting the two duplexes would be an exceptionally high cost for a small user to absorb. By comparison, between the years 1990 and 2001 the highest construction cost actually charged to a user in the Post Rock district was about $12,000. Similarly, the highest cost charged by other districts was far below the $32,000 fee. Many of the higher charges in the various districts were incurred in part because the user had no cheaper alternative. Some of the charges were paid for by federal grants.

Neither the City nor the ECEDC or WEDC ever filed a petition to be released

from the Post Rock district. There is no evidence that Post Rock ever suggested release as an option, and the evidence as a whole indicates Post Rock was opposed to any release. In November of 1996, after this lawsuit was filed, the WEDC wrote to ask Post Rock about several issues, including "information as to the process for requesting that property be released from" the Post Rock district. Def. Exh. 4. In reply, Post Rock's attorney wrote "there is no formal procedure for 'releasing' property from the Post Rock Rural Water District. Potential customers apply for the purchase of a benefit unit and pay the costs associated with hooking up to the rural water district. If a benefit unit is not purchased, water is not supplied to that user. They are not 'released,' per se." Def. Exh. 5.[2]

III. Conclusions of Law.

The court hereby incorporates by reference the conclusions of the law previously set forth in its October 26, 1998 Order, except those conclusions pertaining to the issue remanded by the Circuit.

The Circuit remanded this case "for further consideration of Post Rock's imposition of the $32,000 fee." The question presented is whether Post Rock's practice was excessive, unreasonable, and confiscatory. If it was, then Post Rock has not provided or made service available within the meaning of § 1926. Absent such a showing by the City, Post Rock would be entitled to relief under § 1926.

■ Several factors are relevant in making this determination: (1) whether

the challenged practice allows the district to yield more than a fair profit; (2) whether the practice establishes a rate that is disproportionate to the services rendered; (3) whether other, similarly situated districts do not follow the practice; and (4) whether the practice establishes an arbitrary classification between various users. No one factor is dispositive, and the determination depends on an assessment of the totality of the circumstances.

■ The court has considered the totality of the circumstances and concludes the City has shown, under the standards identified above, that Post Rock's practice was excessive, unreasonable, and confiscatory. Among other things, the court has considered the following. The first factor listed above weighs in Post Rock's favor, as no showing has been made that Post Rock's practice allows it to earn more than a fair profit. Although the City contends Post Rock's assessment of a $25 per hour labor rate allows Post Rock to reap an unfair profit, the court cannot agree in view of the fact that such markups are common practice and rural districts typically assess a surcharge of up to ten percent to cover overhead costs. There is no evidence that the estimated fee of $32,000 included an administrative fee above ten percent of total estimated actual costs.

The second consideration—whether the practice establishes a rate that is disproportionate to the service rendered—weighs toward a finding of excessive, unreasonable, and confiscatory. Due to several factors, including the distance from Post Rock's main line to the Purma Addition,

**2.** K.S.A. 82a–630 provides in part that "[i]f it becomes apparent that certain lands included within a district cannot be economically or adequately served by the facilities of the district, the owners of such lands may petition the county commissioners to release those lands from the district." A petition must be signed by 75% of the owners desiring release and must be endorsed by the board of directors of the district. The county commission shall grant the release if it finds that the granting of the petition "is to the best interests of the affected landowners and the district."

Post Rock's practice would require the user in this case to incur an exceptionally high cost to obtain service. The estimated $32,000 fee far exceeds the average cost to obtain service in most (if not all) districts and exceeds the highest historical cost in many districts. At the same time, the service provided is minimal—providing domestic water to two duplexes in a small town.

The third factor—whether other, similarly situated districts do not follow the practice—also weighs toward a finding of excessive, unreasonable, and confiscatory. The evidence showed that contrary to Post Rock's practice, similarly situated rural districts typically consider whether establishing service is economically feasible for the user, and that when a small user is facing unusually high connection costs, a rural district will typically release the user if a neighboring district or city can provide more economical service. Post Rock's position was that the cost to the user was irrelevant, notwithstanding that the estimated cost of serving the two duplexes in this case was grossly excessive in view of the circumstances of the user and the level of service provided.

The fourth factor—whether the district's practice establishes an arbitrary classification between various users—weighs toward a finding of excessive, unreasonable, and confiscatory. Insofar as releasing customers is concerned, Post Rock has not satisfactorily explained to the court why it released customers in the past—including at least one customer to the City of Ellsworth and others to the City of Wilson—while refusing to consider the possibility of release for the owner of the two duplexes. Additionally, during the relevant time period Post Rock took the position that the ECEDC would not be entitled to any rebate of construction costs if other users were later added to the same service line.

Under the circumstances, this practice would create an arbitrary rate classification between users. Such a practice would have required the ECEDC to bear the full cost of bringing service to the area, while other users who might be added later would be "free riders" able to obtain service at a tremendously discounted rate as compared to ECEDC. The court notes also that ECEDC's position was in sharp contrast to many other small users in the Post Rock district who paid little or nothing to obtain service because construction costs were financed by federal loans or grants.

Post Rock's practice amounted to a practical deprivation of service that had the effect of thwarting development and growth in the area.

Post Rock asserts that its "updated" estimate of connection costs (now said to be possibly as low as $19,000) and its current policy permitting pro-rated rebates of construction costs should be considered by the court and should warrant a ruling in its favor. The court rejects this position. Re-opening the cost estimate and other issues and permitting Post Rock to rely upon a new estimate is beyond the scope of the mandate. The Tenth Circuit concluded that the case should be "remanded to the district court for further consideration of Post Rock's imposition of the $32,000 fee" so as to permit the City to attempt to show "that Post Rock's practice was excessive, unreasonable, and confiscatory." The factors urged for consideration by Post Rock are beyond the issues remanded by the Circuit and would essentially result in the submission of an entirely new case. The court concludes such matters are not properly addressed in this proceeding. As an aside, the court notes that even if such factors were considered here, they would not likely alter the ulti-

mate finding that Post Rock's practice was excessive, unreasonable, and confiscatory.

Post Rock urges the court to find that this dispute was essentially a product of bad faith on the part of the City or the ECEDC. The court disagrees. The court sees no evidence of bad faith. Part of the disagreement between the parties was apparently over the fact that Post Rock could not, and was not required to, provide water in the Purma Addition for fire protection. Contrary to Post Rock's suggestion that fire protection was merely a pretext used by the City to usurp Post Rock's rights, the court concludes that it was a patently legitimate concern for the City, and the installation of City water mains in the Purma Addition was a practical necessity given the fact that Post Rock could not supply water for that use.

In sum, the court concludes the City has shown that Post Rock's practice was excessive, unreasonable, and confiscatory. The court therefore concludes that Post Rock has not made service available within the meaning of 7 U.S.C. § 1926(b) and is not entitled to relief.

IV. Conclusion.

In view of the foregoing findings of fact and conclusions of law, the court hereby orders that the plaintiff Rural Water District No. 1, Ellsworth County, Kansas (commonly known as Post Rock Rural Water District) take nothing and that the action be dismissed. Plaintiff's claim for attorney's fees is likewise denied. Each party shall bear its own costs.

The clerk of the district court is directed to enter judgment accordingly.